UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
UNITED STATES OF AMERICA                     :
                                             :
                                             :
                                             :
         -against-                           :        MEMORANDUM & ORDER
                                             :
                                             :        1:22-cr-553 (ENV)
                                             :
ABDULLAH AT TAQI,                            :
                                             :
                          Defendant.         :
-------------------------------------------------------------- x

VITALIANO, D.J.

On October 24, 2025, following a twelve-day trial, the jury returned a verdict finding

defendant Abdullah At Taqi guilty on all three counts charged: (1) Conspiracy To Provide Material

Support To A Foreign Terrorist Organization (or "FTO"); (2) Attempt To Provide Material Support

To A Foreign Terrorist Organization; and (3) Conspiracy To Commit Money Laundering. *See*

Verdict Sheet, Dkt. No. 213. Before the Court now are At Taqi's motions for a judgment of

acquittal on all three counts, pursuant to Federal Rule of Criminal Procedure 29, *see* Trial Tr.

1278:18-1280:9; 1304:11-13, and, alternatively, for a new trial on Counts One and Three, pursuant

to Federal Rule of Criminal Procedure 33, *see* Mot., Dkt. No. 228; Def. Suppl. Br., Dkt. No. 241,

at 2 n.1, 11.[1] For the reasons set forth below, both motions are denied.

Background

Beginning at the height of the COVID-19 pandemic and continuing for more than two years

thereafter, At Taqi consorted with fellow ISIS[2] sympathizers in relationships that he forged across

---

[1] Citations to pages of the parties' briefing and other filings on the docket generally refer to the Electronic Case Filing System ("ECF") pagination.

[2] "ISIS" refers to the Islamic State of Iraq and al-Sham, an FTO. *See* Trial Tr. 34:7-8. Dr. Charles Winter, an expert in international terrorism, radicalism, and the global jihadist movement, with an emphasis on funding and recruitment methods employed by [ISIS], testified that the internet is the

online platforms engineered for secrecy.[3]  *See generally* Indictment, Dkt. No. 14.  At Taqi himself confirmed that he moved through those channels with an eye for stealth.  "I don't like the messaging apps where you need to use a phone number," he explained, "Making new e-mails is easy but getting phone numbers is hard."  Trial Tr. 358:20-23.  To that end, and to underscore where his loyalties lay, At Taqi concocted aliases and email addresses—some reserved "for ISIS and stuff"—various of which included the number "1435," the year of ISIS's founding.[4]  *See, e.g.*, *id.* at 945:25-946:7; 1311:2-15; 162:11-18.

On a variety of these channels, an account holder known as AlBian, Osama Obeida, and Osama Abuobeida, among other aliases, (hereafter, "AlBian") convinced At Taqi that he was speaking with a "brother from Dawlah," an Arab word for "state" and a "shorthand" for "ISIS." *See, e.g.*, *id.* at 355:19-23; 666:4-7; 1105:5; 93:12-18.  AlBian sent At Taqi an image of an ISIS flag, *see* GX 210B-3DT, and implored, "please do not provide this account to anybody.  It is specific to the work of the brothers between the states," Trial Tr. 1320:18-20.  At Taqi confirmed to another interlocutor that AlBian was "Dawlah 100 percent"; when pressed, "you made sure he was on Haqq and not like Hamas or something," At Taqi reassured, "Oh, no.  He is from Dawlah."[5] *Id.* at 376:22-377:5; 369:3-5.

As their conversations turned to financial contributions, AlBian sent messages to At Taqi, stating, for example, "Brother, this is the link for donations; it is private to us and the money in it

---

"principal channel" on which "ISIS can distribute its propaganda."  Trial Tr. 65:12-17; 69:2-4; 72: 21-23; 125:1-3.

[3] For instance, At Taqi utilized Telegram, where messages could be "timed to auto delete," *see, e.g.*, Trial Tr. 132:20-21, and Element, a "decentralized" platform harnessed by ISIS that boasts "a very high degree of encryption," *see, e.g.*, *id.* at 162:5-10.

[4] During its summation, the government walked the jury through a "key" of aliases and how it came to know that they were connected to defendant.  *See, e.g.*, Trial Tr. 1308:20-21.

[5] Dr. Winter testified not only that ISIS and Hamas are distinct but also that "Hamas would be seen as an enemy" to an ISIS supporter.  Trial Tr. 260:4-20.

goes to the siblings of the POWs." *See, e.g.*, *id.* at 1141:17-19.  In response to such solicitations, between approximately July 2020 and December 2022, At Taqi funneled funds totaling the equivalent of over $3,500 to "accounts linked to AlBian."  *See, e.g.*, *id.* at 33:24-36:23; 655:10-15; 1329:5-6; 1090:15-18.  This sum was comprised of fifteen Bitcoin payments, representing the equivalent of $2,726.45, as well as deposits to PayPal and GoFundMe accounts.  *See, e.g.*, *id.* at 1088:15-17; *see also* GX 307C; GX 210C.

At Taqi had already built this relationship with AlBian when, in late 2021, he encountered "Samir Muwahid," who appeared to be a Muslim man living in America, on Rocket Chat's "ISIS server."  Trial Tr. 321:9-11; 325:23-25; 327:2-3; 513:16-25; 519:3-18.  But this profile actually belonged to Robert Johnson, a confidential human source ("CHS") for the Federal Bureau of Investigation ("FBI") who, unbeknownst to At Taqi, shared screenshots of their conversations with the FBI.[6]  *See, e.g.*, *id.* at 321:12-21; 484:19-23; 519:3-18; 527:14-16.  Johnson first messaged At Taqi about "cryptocurrency and a VPN" in an attempt "[t]o build a relationship" with him; though he claimed to At Taqi that the outreach was a mistake, Johnson had in fact curated these initial messages to attract a response from defendant.  *See, e.g.*, *id.* at 326:1-3, 14-15; 508:13-19.  Referring to At Taqi as "akhi," an Arab word for "brother," Johnson appealed to defendant's religious obligations and thanked him for his advice.  *Id.* at 330:6-9; 515:12-516:18.

Johnson sought to secure At Taqi's trust—and he believed that he did.  *Id.* at 516:19-25.  In fact, as their online relationship blossomed across various platforms through 2022,[7] defendant divulged the subversive nature of his activities, and Johnson became convinced that he supported

---

[6] This Memorandum & Order will refer to both this witness and his online alias as "Johnson."

[7] At Taqi occasionally was "silent" in their chats but never "cut … off" communications with Johnson during the relevant period.  *See, e.g.*, Trial Tr. 517:14-18.

ISIS.[8]  *See, e.g.*, *id.* at 321:9-11.  At Taqi shared that "[i]t's good to send money unnoticed" and suggested that they relocate to different platforms to dodge detection.  *Id.* at 331:10-16; 374:20-25.  At Taqi offered that advice with the experience of having a Telegram account banned due to his presence in a few "dawlah news groups."  *Id.* at 329:5-9.  Determined to accomplish his support objectives, At Taqi maintained "backup" accounts and acknowledged that it could be "difficult" to reach his ISIS contacts "because of the insurgency mode."  *Id.* at 337:20; 340:25-341:1.

During these conversations, At Taqi disclosed that he had connections to ISIS fundraisers.  "[T]he first brother through whom I used to send money got killed," he explained; the colloquy confirmed that this "brother" was likely "on the front lines."  *Id.* at 335:2-9.  At Taqi confided that sending funds to AlBian was "risky."  *Id.* at 373:17-18.  He advised that AlBian inquired whether he knew of "any other bros who [could] help."  *Id.* at 361:6-7.  At Taqi repeatedly "authenticat[ed]" AlBian as a true ISIS "brother."  *See, e.g. id.* at 355:21-23; 449:13-14.  Likewise, At Taqi "vouch[ed]" that Johnson was "akhi" and, therefore, "trustworth[y]."  *Id.* at 377:5-6; 517:2-4.

In May 2022, At Taqi fulfilled Johnson's wish to be introduced to AlBian.  *See, e.g.*, 374:10; 376:6-13.  In addition to AlBian's bona fides, At Taqi shared the "ISIS Banker's" preferred contact method to ensure "safe" communications as well as his preferred Bitcoin wallet.  *See, e.g.*, 376:12-13; 378:12-14.  Johnson began messaging on Element, X, and Telegram with AlBian, who, like At Taqi, was unaware that he was engaging with an informant screenshotting their messages for the FBI "within 30 seconds of the conversation."  *Id.* at 379:10-14; 400:3-5.

With their relationship deepening, AlBian roped Johnson into his ISIS activities, resulting in Johnson's sending funds to the appropriate Bitcoin wallet.  *Id.* at 398:14-25.  AlBian demanded

---

[8] At Taqi and Johnson took their conversations to Telegram, Element, and X (formerly known as Twitter), the latter of which, At Taqi warned Johnson, "isn't very safe for chatting."  *See, e.g.*, Trial Tr. 321:22-322:2; 374:20-21.

secrecy, urging, "brother, use another phone.  Make it to connect only with us and make it to follow the news of the country … And do not put a SIM card in it.  And use the IP and make another phone for your family and for work so that it is difficult for the infidels to discover you."  *Id.* at 405:24-406:3.  He shared photographs of an ISIS flag "along with bullets and ammunitions and a piece of paper containing [Johnson's] user name [sic] and the date," which Johnson testified was intended as "proof that the money [he] was sending was being used to buy munitions and support the Islamic State."  *Id.* at 417:11-20; 433:14-16.  Johnson's confidence in AlBian's ISIS ties grew as the latter shared ISIS news in advance of its release on official ISIS news media, suggesting his involvement with ISIS Central Media.  *See id.* at 414:23-415:12; 435:15-17.

AlBian's solicitations to both At Taqi and Johnson claimed that their donations had charitable ends.  For example, At Taqi confided in Johnson that he was contacted by a "sister" with the X handle "@PalestineUmm" regarding "helping her and family in Ghazzah"; as Dr. Winter testified, "[w]omen are very important to ISIS" and "are celebrated as mothers, as people who support the Mujahideen," an Arab word referring to Islamic State jihadists.  *Id.* at 340:9-11; 360:5-6; 86:7-10.  "It was through her," At Taqi explained, that "I got into contact with the brothers 'cause they had Bitcoin wallet and they would send to her after I sent to them."  *See, e.g.*, *id.* at 340:11-13.  At Taqi also noted, "I believe she supports dawlah."  *Id.* at 342:5.  Both At Taqi and Johnson regularly described their contributions as "sadaqah," a principle of Islam rooted in charity that "ISIS exploits to its own end."  *See, e.g.*, *id.* at 359:14-15; 371:16-20; 140:18-141:7.

Johnson suggested that their contributions may prove important to supporting ISIS; he floated that his "sadaqah" "will help towards the greater cause," and At Taqi responded, "May Allah reward you many folds for every bit you spend in his way."  *Id.* at 368:1-5.  AlBian fueled support for this dual-purpose funding stream—that is, giving money to charitable causes that also

advanced the ISIS agenda—by explaining to Johnson, "We send it to people, it's for poor families. But it is for the Mujahideen. The families of Mujahideen." *See id.* at 452:17-18. He even clarified, "I am responsible for the donations that come to [the] country and I transfer them to the … Mujahideen in all the states afflicted by the infidels." *Id.* at 444:23-445:1. Johnson testified that he understood AlBian to mean that "he was the ISIS money man accepting donations for the terror group from all over and then funneling that money to Islamic State Jihadists in various territories around the world." *Id.* at 445:9-12.

This multi-year effort by At Taqi to support ISIS and to evade law enforcement came to an abrupt end on December 14, 2022, when the FBI Joint Terrorism Task Force knocked on the door of his home in East Elmhurst, New York. *Id.* at 714:25-715:4. When At Taqi came to the door, he volunteered, "Is this for terrorism?" *Id.* at 716:5-10. Approximately seventeen FBI personnel searched the premises for about four hours, *see id.* at 731:17-20, discovering that At Taqi had stockpiled ISIS propaganda on two laptops, five cell phones, and two external drives, *see, e.g.*, GX 301S-309S. His stash included "videos of people being killed and beheaded," images of weapons, media related to former ISIS leader Abu Bakr al-Baghdadi, and ISIS news releases. *See, e.g.*, *id.*; *see also* Trial Tr. 1097:1-3.

The three-charge indictment against At Taqi followed on December 20, 2022, *see* Dkt. No. 14, and though two others indicted with him would plead guilty, *see* Dkt. Nos. 87; 175, At Taqi elected to go to trial; opening statements in the jury trial against him commenced on October 8, 2025, *see* Trial Tr. 43:11-53:20. The jury returned a verdict of guilty on all counts on October 24, 2025. *See* Dkt. No. 213. The jury was polled, and each juror embraced the verdict with respect to each count. *See* Trial Tr. 1561:11-1565:7.

Legal Standards

Under Rule 29, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. But the road to Rule 29 relief is encumbered by the movant's "'heavy burden'" to challenge the sufficiency of the evidence. *United States v. Fabian*, 171 F.4th 174, 185 (2d Cir. 2026) (internal citation omitted). A conviction must be upheld so long as, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *see also United States v. Parks*, 179 F.4th 144, 150 (2d Cir. 2026).

Rule 29 does not alter the standard that the jury receives to guide its review of the evidence. For example, circumstantial evidence alone may form the basis of the jury's verdict. *See, e.g.*, *United States v. Wynder*, 147 F.4th 200, 212 (2d Cir. 2025); *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020). Further, a Rule 29 movant's burden is even heavier in the context of a conspiracy conviction, where "deference to the verdict is pronounced." *Wynder*, 147 F.4th at 212. "That is because 'a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (internal citation omitted).

A motion for a new trial is related yet distinct. Rule 33 provides a trial court with discretion "to vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The heart of the inquiry is whether there is "'a real concern that an innocent person may have been convicted,'" *United States v. McPartland*, 81 F.4th 101, 123 (2d Cir. 2023) (internal citation omitted), and "'whether letting a guilty verdict stand would be a manifest injustice,'" *United States v. Mensah*, 110 F.4th 510, 528 (2d Cir. 2024) (internal citations omitted). The

defendant "bears the burden of proving" entitlement to a new trial, *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009); he must establish "'exceptional circumstances'" that warrant intrusion upon the jury's role, *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000) (internal citation omitted).

The Rule 33 inquiry is not limited to the quantum and quality of the evidence introduced and reviewed at trial. The trial process itself—that is, the conduct of court, counsel, and jury—can also be the subject of the Rule 33 inquiry. *See, e.g.*, *United States v. Aguilar*, 742 F. Supp. 3d 322, 334 (E.D.N.Y. 2024); *Mensah*, 110 F.4th at 529; *United States v. Sabhnani*, 599 F.3d 215, 249 (2d Cir. 2010). Importantly, the standard of review does not vary.

Indeed, a Rule 33 motion presents "a very high hurdle" for a defendant seeking a new trial due to purported juror misconduct. *United States v. Stewart*, 317 F. Supp. 2d 432, 436 (S.D.N.Y. 2004). Although "extra-record information of which a juror becomes aware is presumed prejudicial … [a] government showing that the information is harmless will overcome this presumption." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002).

Discussion

I.      Rule 29 Motion for a Judgment of Acquittal

As Rule 29 requires, At Taqi moved orally for a judgment of acquittal on all three counts after the government rested and dutifully renewed that motion on the same grounds at the close of the case. *See* Fed. R. Crim. P. 29(a); *see also* Trial Tr. 1278:18-1280:9; 1304:11-13. The defense argument zeroed in on the conspiracy counts, with counsel arguing that there was insufficient evidence showing that At Taqi and AlBian ever agreed on a common objective with respect to either conspiracy. *Id.* at 1278:18-1280:9. As for the attempt count, the defense argued, briefly, that the government failed to establish At Taqi's "intent to fund ISIS"; his intent, as shown by the

8

evidence, counsel claimed, "was only to send money to refugees." *Id.* at 1280:4-9. At Taqi did not address the substantial-step element of the attempt charge or aiding and abetting, nor did he bolster this argument upon renewal at the close of the case. *See, e.g.*, *id.* at 1280:4-9; 1304:11-13. In its opposition, the government relied on the mounds of evidence supporting the charges and pointed out that, with respect to those charging At Taqi with material support for an FTO, the government's burden was to prove that At Taqi conspired and attempted to materially support an FTO and to launder money—not that he succeeded in doing so. *See id.* at 1280:15-1283:18. The Court reserved decision. *Id.* at 1283:19-1284:4; *see also* Fed. R. Crim. P. 29(b). Following the return of the jury verdict convicting defendant on all counts, counsel were invited to file post-trial briefing if they so desired. *See* Dkt. Nos. 209-210.

Here, At Taqi chose not to supplement his Rule 29 argument with post-trial briefs. Especially given the high but plain bar that *Jackson* sets, it is hard to imagine what more counsel could have written on this issue. 443 U.S. at 319. At Taqi's oral motion with respect to the two conspiracy counts gains little traction on the steep hill it must climb, and prospects that a written submission would advance his cause beyond that are slim. *See Fabian*, 171 F.4th at 185. Indeed, given the robust collection of evidence demonstrating At Taqi's guilt on the conspiracy charges, the Court denies his Rule 29 motion as to both Counts One and Three.

At Taqi's Rule 29 challenge to the attempt charge set forth in Count Two meets an identical fate. The defense argument supporting the contention that the attempt count was not supported by sufficient evidence was presented as only a terse and conclusory two-sentence pitch. Trial Tr. 1280:5-7. In all practical terms, this is an argument that was abandoned. Indeed, where "abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment

9

was intended." *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).  In any event, as with the conspiracy counts, the evidence of At Taqi's guilt is abundant in this trial record, and even if a Brandeis brief were filed, the result would be the same.  Like Counts One and Three, there is no basis to disturb the jury's guilty verdict on Count Two, and this motion is also denied in this respect.

II.     Rule 33 Motion for a New Trial

As is common in cases where post-verdict briefing is supplied on a Rule 29 motion seeking acquittal, a new trial is also sought, in the alternative, by application under Federal Rule of Criminal Procedure 33.  *See generally* Mot.  What is unusual is the motion's limitation in scope to Counts One and Three.  *See* Def. Suppl. Br. at 2 n.1, 11; *see also* Mot.  In this case, the limitation is hardly surprising, for it is precisely and inescapably congruent with the precedent that principally animates At Taqi's alternative application for relief.  *See United States v. Lawson*, 677 F.3d 629, 651, 651 n.29 (4th Cir. 2012); *see also* Opp., Dkt. No. 223, at 29.[9]  Juror misconduct constitutes the sole ground for At Taqi's new trial request under Rule 33.  *See* Mot.; *see* also Def. Suppl. Br.

Lending credence to the impregnable result of the jury's verdict, At Taqi's Rule 33 motion, at its essence, is about process, not proof.  Consequently, the background facts discussed above provide context but offer little insight into the bona fides of At Taqi's quest for a new trial on his conspiracy convictions.  Instead, the latter begins with a post-mortem discussion of the background facts relative to the jury's deliberative process.

That discussion finds its roots in an optional post-verdict meeting with the jury on October 24, 2025.  *See* Hodson Decl., Dkt. No. 228-1.  All twelve jurors attended, as did defense counsel Sabrina Shroff, Sasha Hodson, an investigator with the Federal Defenders of New York, Inc., the

---

[9] In *Lawson*, the Fourth Circuit held that even if the court were to set aside the conspiracy convictions, on account of jury improprieties affecting the conspiracy counts, the attempt conviction would remain undisturbed.  677 F.3d at 651 n.29; *see also* Opp. at 29.

10

Court's courtroom deputy, two law clerks, and a judicial intern. *Id.* at 1-2. During this debriefing session, Juror #5 volunteered that during deliberations she conducted internet research into the term "conspiracy" to address her "confusion" about the jury instructions. *Id.* at 2. Her definitional research returned information about "'unilateral' and 'bilateral'" conspiracies. *Id.* Juror #5 stated that she shared "at least some" of her findings with other jurors, and that Google's insights were not helpful, as she "was still confused about which types of conspiracies [are] recognized in New York." *Id.* at 2-3. The other jurors made no comment about Juror #5's revelation. *Id.* at 3. Within two weeks of the verdict, the Court received letters from Jurors #12 and #2, written principally to encourage the Court's leniency in sentencing; neither addressed Juror #5's research. Dkt. Nos. 211; 211-1. Though to no one's surprise, the defense motion to set aside the verdict and order a new trial on account of Juror #5's impropriety quickly followed. *See* Dkt. No. 228.

In a Memorandum & Order dated February 7, 2026, the Court held that Juror #5 violated the Court's explicit instructions by conducting internet research into the term "conspiracy" and sharing some of that information with fellow jurors. Dkt. No. 230. Specifically, Juror #5 violated the Court's repeated directive that the trial was a "no homework zone," and "internet searching" was strictly prohibited. *See, e.g.*, Trial Tr. 6:8-11. This rule became a steady drumbeat in this case, stretching from jury selection, when United States Magistrate Judge Taryn A. Merkl provided five such directions, through trial, when the Court reminded the jury of these instructions twenty-one times, including at every major break in proceedings. *See, e.g.*, Trial Tr. (Jury Selection) 35:21-25; Trial Tr. 41:11-13; 1528:8-10. The Court explained that it "constantly repeat[s]" these directions "because they're so important to ensure the fairness of a trial." *Id.* at 5:8-10.

Upon its finding of an extra-record impropriety during jury deliberations, the Court convened a non-adversarial, *in camera* "*Remmer* hearing" to assess whether the conspiracy

11

convictions "infringed [At Taqi's] constitutional rights to due process, fairness, and [full] consideration," guided by the controlling law.  Dkt. No. 230 at 1-2.  *See Remmer v. United States*, 347 U.S. 227, 229-30, 74 S. Ct. 450, 451-52, 98 L. Ed. 654 (1954).  As Second Circuit case law does not provide substantial guidance on such a proceeding's logistics, the Court reviewed suggestions from prior cases, which entrust district courts with "wide discretion" on this front, particularly when the purported prejudice derives from a statement by a juror herself.  *See, e.g.*, *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir. 1987) (internal citation and quotation marks omitted);[10] *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994).  The Court invited the parties to submit questions for potential incorporation in the inquiry, in addition to those that At Taqi already proposed in his initial briefing.  *See* Dkt. No. 230; *see also* Dkt. No. 226 at 11; *Calbas*, 821 F.2d at 894, 897.  To allow for transparency, the Court made available to the parties a video livestream of the proceeding in a separate, sealed courtroom.  *See* Mar. 6, 2026 Order.  To protect jurors' privacy, the Court directed the parties to file all submissions in connection with the *Remmer* hearing under seal.  *See, e.g.*, Dkt. No. 230 at 2.

Upon ample notice to the participating jurors, parties, and courthouse staff, the *ex parte Remmer* hearing proceeded as scheduled on March 18, 2026.  *See, e.g.*, Hearing Tr., Dkt. No. 238. The Court examined Jurors #5 and #1 (the foreperson) separately and under oath in the presence of the Court's courtroom deputy, one law clerk, and a court reporter, *see generally id.*, and found the testimony of both jurors to be credible *see United States v. Aiyer*, 433 F. Supp. 3d 468, 476 (S.D.N.Y. 2020), and, consistent, *cf. Lawson*, 677 F.3d at 641.  Indeed, the testimony was so consistent in all material respects that the Court saw no need to call additional jurors as witnesses.

---

[10] As in At Taqi's case, in *Calbas*, the extra-record research "was first discovered by" the defendant's counsel while "discussing the case with certain members of the jury" on "the day the jury returned its verdict."  821 F.2d at 894; *see also* Hodson Decl.

12

Importantly, Juror #5 corroborated her statements from the post-verdict meeting that she "looked up the meaning" of conspiracy on Google AI and shared that she conducted research with fellow jurors; she also clarified that she did so alone on Wednesday, October 22, 2025, the one-day recess in deliberations.[11]   Hearing Tr. 6:7-18, 8:12-21.   The Court confirmed that to the extent that there would be a public record of the *Remmer* hearing following the issuance of the corresponding Memorandum & Order, the testifying jurors' names would be redacted on the public docket.  *Id.* at 46:20-23.  As permitted by the Court, *see* Apr. 10, 2026 Order, each party filed a supplemental post-*Remmer* hearing brief, *see* Gov't Suppl. Br., Dkt. No. 242; Def. Suppl. Br.

In step with the opportunity to inquire afforded by the *Remmer* hearing, to determine whether the injection of extra-record information into the deliberative process was harmless, a trial court assesses "(1) the nature of the information … at issue, and (2) its probable effect on a hypothetical average jury," an "objective" analysis informed by the entire record.  *United States v. Farhane*, 634 F.3d 127, 168-69 (2d Cir. 2011).  The goal of the *Remmer* hearing with respect to the first prong was to take testimony that would identify what extra-record information, if any, was injected into the jury room.  The defense's post-*Remmer* hearing supplemental brief assumes what is directly contradicted by testimony: that Juror #5 conveyed the fruits of her research to fellow jurors, and her internet findings thereby constitute the relevant extra-record information.  *See, e.g.*, Def. Suppl. Br. at 7.   The *Remmer* hearing testimony, however, made clear that the jurors interrupted Juror #5's attempted introduction of her research after "only a few words."  *See, e.g.*, Hearing Tr. 41:14-18.  The elemental question is, assuming for the sake of argument that Juror #5

---

[11] This testimony clears Federal Rule of Evidence 606(b)(2)(A), which permits a juror to testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A).

could intelligently communicate information that she claims confused her, *see e.g.*, *id.* at 10:5-10; 42:15-21, were those "few words" of a type that would adversely affect the process of a hypothetical average jury? *See Farhane*, 634 F.3d at 168-69. The answer is no; those "few words" that Juror #5 got to utter were, in the totality of the circumstances, harmless. *See id.*

Specifically, the foreperson recalled Juror #5's sharing that "she had done, like, some Googling of the word 'conspiracy.'" Hearing Tr. 38:23-25. "[W]hen [Juror #5] said that," Juror #1 and "several" other jurors "all at once" exclaimed, "Wait, wait, wait. What are you talking about? What do you – what do you mean you did research?" *Id.* at 39:1-4. Juror #1 did not wish to use the verb "shout" to describe the jury's response, but she made clear that the jurors immediately and in unison shut down Juror #5's remarks. *See id.* at 39:2-4. When asked if she recalled "any of the details of what [Juror #5] said about" the research results, Juror #1 testified, "I only remember her saying she had looked up 'conspiracy.' I – I honestly think we pretty much cut her off before she could say anything further." *Id.* at 39:20-24; *see also id.* at 12:12-13. "She didn't tell us what she concluded," Juror #1 continued. *Id.* at 42:14. Meeting this reception, Juror #5, in her own words, "let it go." *Id.* at 12:18-23. "The next time" the research "came up," according to Juror #1, "was when [the jurors] were talking to the defense counsel after trial." *Id.* at 39:17-18. Tellingly, whatever information Juror #5 gleaned could not have even been effectively communicated to fellow jurors because, as she admitted, she did not understand it herself. *See, e.g.*, *id.* at 10:5-10; 42:15-21; *see also* Hodson Decl. at 2.

As for the second factor, namely, whether the awareness of the extra-record information by a hypothetical average jury would be harmless, *see Farhane*, 634 F.3d at 169, courts in the Second Circuit employ a variety of measuring sticks, including the Court's instructions, the circumstances surrounding the extra-record information, a comparison of its substance to the "information of

14

which the jurors were properly aware," the deliberation timeline, and the strength of the evidence properly admitted at trial.  *See* Opp. at 17-18 (citing *Farhane*, 634 F.3d at 169-70; *Greer*, 285 F.3d at 173-74; *Loliscio v. Goord*, 263 F.3d 178, 189-90 (2d Cir. 2001)*; United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985)).  The facts developed at the *Remmer* hearing demonstrate that the acquisition of extra-record information was limited to Juror #5's definitional research, and, practically speaking, the immediate smothering response of her fellow jurors handicapped any attempt to disseminate it.  *See generally* Hearing Tr.  In *Calbas*, the Second Circuit sustained the jury's verdict and endorsed the district court's consideration of its "finding that the jury preempted discussion of … information" that a juror obtained by consulting an extra-record telephone directory in rendering its post-verdict assessment of prejudice.  821 F.2d at 894, 896 n.9.

Likewise, here, Juror #1 testified that she and fellow jurors "preempted," *id.* at 896 n.9, Juror #5's account of her extra-record findings, including by way of Juror #1's reference to "the huge stack of instructions" provided by the Court in hard copy for reference during deliberations, *see* Hearing Tr. 39:8-9; *see also* Final Charge, Dkt. No. 214-1 (Ct. Ex. 2).  Juror #1 thereby reoriented the jury with the reminder, "this is what the law is," quashing any potential prejudice. *Id.* at 39:10.  The minimal information that Juror #5 conveyed before she was halted pales in comparison to the information of which the jurors were properly aware.  *See Weiss*, 752 F.2d at 783.  Indeed, Juror #5 testified, "I didn't get to elaborate on anything," *id.* at 28:23, confirming the stifling of the extra-record information, and the foreperson corroborated, "I don't remember her telling us anything about, like, the specifics," *id.* at 40:20-22.

Further, there is a strong presumption that juries "follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709, 95 L. Ed. 2d 176 (1987).  To be sure, Juror #5 breached that principle by conducting what she understood to be dictionary-style research.  *See,*

15

*e.g.*, Hearing Tr. 11:7-9. Juror #1's reminder about the materials available for proper consideration, *id.* at 39:10, suggests that a hypothetical average jury would, too, have understood those limitations. It reaffirms that the jury was aware of the source of the controlling law, including the Court's instruction that "while the lawyers may have commented on some of these legal rules, [the jury] must be guided only by what I instruct you about them." Dkt. No. 214-1 at 11. In other words, the jury was to follow only the Court's instructions on the governing law.

In order not to lose sight of the forest for the trees, in contemplating the impact of extra-record information on a hypothetical average jury's verdict, it is important to consider the evidence that was properly before the jury. *See, e.g.*, *United States v. Guzman Loera*, No. 09-cr-0466, 2019 WL 2869081, at *15-16 (E.D.N.Y. July 3, 2019). Here, there was a harvest of trial evidence pointing to At Taqi's guilt on the two conspiracy charges in issue on this motion. *See generally* Trial Tr.; *see also United States v. Curcio*, No. 24-cr-312, 2026 WL 2168353, at *10 (S.D.N.Y. July 27, 2026). Further, the approximate day-and-a-half between Juror #5's research revelation to fellow jurors and the verdict reassure the Court that "there was no rush to judgment" following Juror #5's misconduct. *Loliscio*, 762 F.3d at 190; *see also* Gov't Suppl. Br. at 5. Assessing these factors, including the instant rebuff and rebuke by fellow jurors blocking the diffusion of the research virtually at its start, the conclusion of what effect such extra-record information might have on a hypothetical average jury is inescapable—in a word, it would be "harmless." *See Farhane*, 634 F.3d at 169.

There can be no doubt that "investigation of juror misconduct … is a delicate and complex task." *United States v. Cox*, 324 F.3d 77, 86 (2d Cir. 2003) (internal citation and quotation marks omitted). That investigation must protect and vindicate the right of the defendant to due process, guard "the sacrosanctity of the jury box," and honor the sacrificial service of each juror. *Rosemond*

16

*v. United States*, 378 F. Supp. 3d 169, 186 (E.D.N.Y. 2019).  On the totality of the relevant and admissible evidence amassed in this record, the government has carried its burden—the presumption of prejudice is rebutted, and the jury's verdict is sustained.  *See Greer*, 285 F.3d at 173.  As a consequence, since this is the only ground upon which At Taqi seeks a new trial, his Rule 33 motion is denied.

### Conclusion

For the foregoing reasons, At Taqi's Federal Rule of Criminal Procedure 29 motion for a judgment of acquittal on all counts and, in the alternative, his Federal Rule of Criminal Procedure 33 motion for a new trial on Counts One and Three are both denied.

The parties are directed to file, as appropriate, versions of their submissions currently filed under seal as Docket Nos. 230, 231, 232, 233, 241, and 242, that redact the names of Chambers' staff members and jurors.

Following the completion of the Presentence Investigation Report by the United States Probation Office, the Court will set a sentencing date for defendant Abdullah At Taqi.

So Ordered.

Dated:        Brooklyn, New York
              July 31, 2026


                                            /s/ Eric N. Vitaliano
                                            _____
                                            ERIC N. VITALIANO
                                            United States District Judge